**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

UNITED STATES OF AMERICA,

                                                 CR 06-47-M-DWM

                 Plaintiff,

      vs.

                                              FINDINGS & RECOMMENDATION
                                              OF UNITED STATES
                                              MAGISTRATE JUDGE

MARIO ARAMBULA TRINIDAD,

                 Defendant.

_____

      The Government has charged Defendant by indictment with one count of possession with intent to distribute methamphetamine. Defendant has since moved to suppress statements he made during a traffic stop on April 2, 2006, as well as evidence seized after a search of his vehicle was conducted by law enforcement personnel.

      Chief Judge Donald W. Molloy has referred the motion to suppress to the undersigned for initial determination. Pursuant to this referral, the undersigned held a suppression hearing on November 15, 2006. Based on the evidence and testimony presented at the suppression hearing,

      **IT IS RECOMMENDED** that Defendant's Motion to Suppress (dkt #6) be **GRANTED**.

PAGE 1

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel on or before **November 28, 2006.**[1]

DONE and DATED this 20th day of November, 2006.


_/s/ Jeremiah C. Lynch_____
Jeremiah C. Lynch
United States Magistrate Judge

## Discussion

### I.  Factual Background

The Court makes the following factual findings based on the evidence and testimony presented at the hearing.  That evidence included an on-board video of the traffic stop and the entire encounter which occurred between the Defendant and law enforcement personnel.

On the afternoon of April 2, 2006, Montana Highway Patrol Officer Mike Donnelly was patrolling Interstate 90 near Superior, Montana, when he heard several dispatches advising that a tan car with a black top was exceeding 100 miles per hour on the interstate.  Shortly thereafter, Officer Donnelly observed a

---

[1] _United States v. Barney_, 568 F.2d 134, 136 (9th Cir. 1978) (the court need not give the parties the full ten day period set forth in 28 U.S.C. § 636(b)(1) within which to file objections).

vehicle matching that description and stopped it for speeding.
The Defendant, Mario Trinidad, was the driver of the car, and he
had two passengers – his brother, Bulmaro Trinidad, and his
girlfriend, Nicole Shreve. Officer Donnelly approached the car
from the passenger side and observed immediately that all three
occupants of the car were visibly nervous.  He immediately asked
Defendant for his driver's license and registration, and asked
the two other occupants for identification as well.  After
viewing the requested documents, Officer Donnelly told Defendant
that he was only going to write him a warning for speeding and
directed the Defendant to accompany him back to his patrol
vehicle.

    With Defendant seated next to him in the patrol car, Officer
Donnelly contacted dispatch to check for warrants and verify the
registration information on the car.  While awaiting a response
from dispatch, Officer Donnelly wrote the warning and questioned
Defendant as to his travel plans.  Defendant, a native Spanish
speaker, responded in broken English indicating that they were
coming from the Salt Lake area but that he did not know the name
of their city of destination.  He explained further that they
were going to visit his girlfriend's grandfather, whose name he
did not know.  During their conversation, Officer Donnelly noted
that Defendant's nervous behavior continued, as evidenced by the
fact that he was sweating, shaking, and looking at the floor.

    Defendant had been sitting in the patrol car for roughly

PAGE 3

twelve minutes when Officer Donnelly returned to Defendant's car to get a date of birth from Bulmaro Trinidad.  While at the car, Officer Donnelly noted that Bulmaro appeared to be praying with a wallet-sized picture of Saint Pedro in hand.  In Officer Donnelly's experience, Mexican nationals crossing the border into the United States consider Saint Pedro to be their patron saint.

Officer Donnelly then walked back to the patrol car and continued questioning Defendant as to his travel plans.  Dispatch eventually radioed back that there were no outstanding warrants. Officer Donnelly testified that the vehicle was properly licensed and registered to the Defendant and that the Defendant had a valid drivers license.  At that point, Officer Donnelly told Defendant he was "free to go."  This was some 27 minutes after Officer Donnelly initiated the stop and more than 20 minutes after Defendant took a seat in the patrol car.

While it is clear that Officer Donnelly told Defendant he was "free to go," the parties dispute whether a reasonable person would have indeed felt free to leave under the circumstances.  As Defendant began to exit the vehicle immediately after being advised he was free to go, Officer Donnelly asked Defendant if he could continue his questioning.[2]  Defendant responded by asking

---

[2] The Defendant testified that Officer Donnelly told him to get back in the car.  The Court finds, however, no such directive was given.  During this exchange, Officer Donnelly, as admitted by the Defendant, remained seated in the patrol car which resulted in the exchange being recorded by the on-board recording device.

PAGE 4

"you can make me more questions?" to which Officer Donnelly answered "yeah."  Defendant took a seat in the patrol car again, and Officer Donnelly continued questioning him.

Officer Donnelly began by once again asking about Defendant's travel plans, learning for instance that although Defendant planned on staying at his destination for two days, the only clothes Defendant had with him for the trip from Salt Lake were those on his back.  A few questions later, Officer Donnelly began asking Defendant about the presence of drugs in the car. After Defendant denied any involvement in transporting drugs, Officer Donnelly told Defendant he had a form he wanted him to read and asked if he could read Spanish.  Defendant confirmed that he could, but asked permission "to ask one question, sir, because I upset."  Officer Donnelly said "ok," to which Defendant said "But I say I'm go."[3]  Rather than advising the Defendant he was free to go, Officer Donnelly pressed the Defendant as to whether he had drugs, guns, or knives in the car.  Defendant denied having any such contraband.

For the next ten minutes, during which a confused and halting discussion continued, Officer Donnelly began to repeatedly seek permission to search the car.  Officer Donnelly

---

[3] The Defendant stated his desire to go approximately thirty-three (33) minutes after the traffic stop began and approximately twenty-eight (28) minutes after he had been directed to sit in the patrol car.

PAGE 5

orally asked the Defendant for permission to search seven
different times, during the same time intermittently telling the
Defendant to read the "Spanish form," referring to the consent
form.  In response to the first four requests to search, the
Defendant did not specifically respond.  Ultimately, the
following exchange occurred which established the Defendant did
not want to give permission:

> Officer Donnelly: I want to search your car.  The Camero.  I
> want to search your Camero.  Can I search your Camero?
>
> Defendant: So, I say that...
> Officer Donnelly: It's yes or no.
> Defendant: No.[4]
> Officer Donnelly: Yes or no?
> Defendant: I say, Ok, sir...
> Officer Donnelly: Ok.
> Defendant: So...
> Officer Donnelly: Ok, so yes.
> Defendant: So, no, I say ok but I own it. See? I understand
> you no believe me.  So, it's no believe me, I say OK.  So, I
> accept that she has...(inaudible).

Finally, Officer Donnelly directed the Defendant to the
consent form, told him to read it, and approximately five seconds
later, directed him to sign it.

> Officer Donnelly: Read this in Espanol.
> Defendant: Ok.
> Officer Donnelly: Ok. Sign right here.

---

[4] Officer Donnelly testified that he thought Defendant said
"Oh."  Upon review of the on-board video, the Court finds that
Defendant said "No."

Defendant: I want to read first.

Officer Donnelly: Oh, I thought you read it.

Defendant: No.

Defendant eventually signed the consent-to-search form, although the precise timing of the signature is not clear. Officer Donnelly promptly searched the car and found more than fifty grams of pure methamphetamine and a 9 millimeter handgun.

## II.  Custodial interrogation for purposes of *Miranda*

Defendant initially moves to suppress "all evidence and statements" obtained from him during the traffic stop on the basis that Officer Donnelly's failure to administer *Miranda* warnings violated his Fifth Amendment right against self-incrimination.   For *Miranda* to apply, a suspect must be in custody and subject to interrogation.  *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).  It is Defendant's position that he was in custody during the traffic stop, and Officer Donnelly should have advised him of his rights under *Miranda* before interrogating him. The Government, in contrast, argues that Defendant was neither in custody nor subject to interrogation, and that *Miranda* warnings were not required.

In *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984), the United States Supreme Court held that because traffic stops are typically noncoercive, "persons temporarily detained pursuant to such stops are not 'in custody' for purposes of *Miranda*."   The *Berkemer* court correspondingly recognized, however, that "the

PAGE 7

safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Id.* (*quoting California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  In other words, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subject to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."  *Id.*

Whether Defendant was in custody for purposes of *Miranda* thus depends on whether his freedom of action was curtailed to a degree associated with formal arrest.  The Court finds that it was not.  Although Officer Donnelly instructed Defendant to take a seat next to him in the patrol car, Defendant was not handcuffed or subject to any other form of direct physical restraint.[5]  Officer Donnelly was the only officer present for virtually the entire stop, and while Defendant remained in the patrol car for almost forty minutes, he was seated in the front seat with the door unlocked.

Defendant cites *United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987), *modified*, 830 F.2d 127, for the proposition

---

[5] According to Defendant's testimony at the suppression hearing, Officer Donnelly instructed him to lock the door of the patrol car when he resumed questioning him immediately after telling him he was free to go.  Because it is clear from the on-board video, however, that Officer Donnelly did not at any time direct Defendant to lock the doors, the Court finds that Defendant's testimony on this point is not credible.

that, because he was isolated from his brother and girlfriend during the stop, he was in custody for purposes of *Miranda*.  The present case is factually distinguishable from *Beraun-Panez* in which the defendant cattle ranger was separated from his co-workers and questioned in the isolation of the Idaho range. The Defendant in this case was at all times in public view on the interstate highway.  As the Supreme Court has recognized, "[t]his exposure to public view both reduces the ability of unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse."[6]  *Berkemer*, 468 U.S. at 438.

The Court thus finds that Defendant was not in custody for purposes of *Miranda* because a reasonable person in his situation would not have believed that his freedom of movement was restrained to the degree associated with a formal arrest.  Having determined that Defendant was not in custody for purposes of *Miranda*, the Court need not address the Government's alternative

---

[6] It is important to note that while the stop and questioning of the Defendant on the interstate highway was in "public view," the Court cannot ignore the fact that such stop is, as a practical matter, somewhat isolated.  The public passes by at highway speeds and there is not pedestrian traffic.  In short, the public does not "witness" the interaction of officer and motorist in any meaningful way as contemplated by the Court in *Berkemer*, 420 U.S. at 438.

PAGE 9

argument that he was not subject to interrogation.[7]

While the restraints on Defendant's freedom of movement may not have been of the degree associated with a formal arrest, this does not necessarily mean that Defendant was voluntarily present. If the encounter was not consensual, and if Officer Donnelly did not have reasonable suspicion to continue to detain Defendant and expand the scope of the questioning beyond that of the traffic stop, then suppression would likely be required. *See United States v. Chavez-Valenzuela,* 268 F.3d 719 (9th Cir. 2001), *amended,* 279 F.3d 1062 (2002).

### III. Applicability of *Chavez-Valenzuela*

In *Chavez-Valenzuela*, the Ninth Circuit held "that nervousness during a traffic stop...in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity, and does not justify an officer's continued detention of a suspect after he has satisfied the purpose of the stop." *Chavez-Valenzuela*, 268 F.3d at 726. The defendant in that case "had been standing by the side of a

---

[7] The Court does not overlook the fact that separating a subject from others, as was done to this Defendant, is a technique of psychological coercion. *Beraun-Panez*, 830 F.2d at 127. This appears especially true where the Defendant, a Mexican national with very limited understanding of the English language, could have been assisted by his girlfriend, a United States citizen, in fully comprehending the nature of the encounter and his rights. Consequently, the isolation technique used by Officer Donnelly bears upon the calculus of whether the Defendant voluntarily consented to the search of his vehicle.

PAGE 10

highway for more than seven minutes and subjected to a number of 'fishing expedition' questions about his travel plans and his occupation." *Id.* Immediately upon returning the defendant's license and registration, the officer "asked him a question implying that he suspected Chavez-Valenzuela of criminal activity." *Id.* at 725. The Ninth Circuit concluded that a reasonable motorist confronted with that situation "most likely would not have believed he could disregard the officer's inquiry and end the conversation." *Id.* Because the defendant was not voluntarily present during the encounter, and because the officer did not have reasonable suspicion to prolong the detention and expand the scope of his questioning, the court concluded that "[t]he questioning about drugs violated Chavez-Valenzuela's Fourth Amendment rights, and the taint of th[at] violation overr[ode] his subsequent voluntary consent to the search of his vehicle." *Id.*, at 728.

Whether *Chavez-Valenzuela* requires suppression in this case depends first on whether Defendant's encounter with Officer Donnelly was consensual. "An encounter is not consensual if 'a reasonable person would have believed he was not free to leave.'" *Id.* at 724 (*quoting United States v. Mendenhall*, 446 U.S. 544, 544 (1980)). The question then, is whether a reasonable person in Defendant's situation would have felt free to leave after receiving his warning notice, rather than remain and answer

PAGE 11

additional questions.

Defendant had been sitting in the patrol car for some twenty minutes when Officer Donnelly completed the warning notice, returned Defendant's materials, and informed him that he was "free to go."  Defendant concedes that Officer Donnelly stated he was free to go, but claims he believed otherwise under the circumstances.  The Government, of course, takes the position that a reasonable person in Defendant's circumstances would have felt free to leave after being so advised by the law enforcement officer.

While Officer Donnelly indeed stated that Defendant was "free to go," that statement was no more than perfunctory under the circumstances, followed as it was by the officer's immediate request to ask more questions.  There was literally no break in the dialog as Officer Donnelly informed Defendant he was free to go, but segued within seconds into pursuing a new line of questioning.  Their exact exchange was as follows:

> Officer Donnelly: You're free to go. Alright?
> Defendant: I'm sorry sir.
> Officer Donnelly: That's fine. How do you say your first name?
> Defendant: Mario.
> Officer Donnelly: Mario?
> Defendant: Mario.
> Officer Donnelly: Mario, can I ask you more questions? Can I ask you more questions?
> Defendant: Me? You can make me more questions?

PAGE 12

Officer Donnelly: Yeah.

Officer Donnelly confirmed at the suppression hearing that Defendant's response was inquiring in nature.  Particularly given Defendant's evident difficulty with the English language, it is reasonable to read his question as one bearing upon the officer's authority to ask more questions, to which Officer Donnelly responded "yeah."  Defendant had by this time been sitting in the patrol car for just over twenty minutes, was separated from his companions, and had been answering Officer Donnelly's repetitive and persistent background questions.  Although Officer Donnelly eventually stated that Defendant was "free to go," a reasonable motorist in Defendant's position, particularly one with a similar language barrier, would not have believed he was in reality free to go in light of the officer's immediate request to continue the questioning.  For these reasons, the Court finds that Defendant was not voluntarily present from that time forth.

Having so found, the next question is whether Officer Donnelly had reasonable suspicion to prolong the detention and ask additional questions.  As Defendant notes, the Ninth Circuit made clear in *Chavez-Valenzuela* that nervousness alone does not give rise to reasonable suspicion.  *Chavez-Valenzuela*, 268 F.3d at 726.  The propriety of Officer Donnelly's expansive line of questioning thus depends on whether he had reasonable suspicion of another crime based on particularized and objective facts. *See United States v. Perez*, 37 F.3d 510, 513 (9th Cir. 1994) (officer

PAGE 13

may expand scope of questions beyond matters related to the traffic stop if he has reasonable suspicion based on particularized, objective facts).

Here, there were particularized and objective facts giving Officer Donnelly reason to suspect other criminal activity. Not only did Defendant display nervous behavior throughout the stop, but the other two occupants of the car were also visibly nervous. In addition, Defendant's brother had only a Mexican voter card for identification and was apparently praying to the patron saint of border crossers. These factors, in combination with Defendant's uncertainty as to his destination and the name of the person he was visiting, were sufficient to give Officer Donnelly reason to suspect that other criminal activity was afoot. He was entitled to prolong Defendant's detention on that basis and expand the scope of his questioning to ask about the presence of contraband in the car.

Defendant consistently answered Officer Donnelly's questions in the negative, denying the presence of drugs. It was only after Defendant signed the consent-to-search form that Officer Donnelly discovered the methamphetamine at issue. This brings the Court to the final question, which is whether Defendant's consent to search the vehicle was voluntarily given. For the reasons explained below, the Court finds that it was not.

PAGE 14

**IV.   Consent to search**

Consent to search a vehicle must be voluntarily given.
*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).  Whether consent
to search was voluntarily given "is a question of fact that is
determined by considering the totality of the circumstances."
*United States v. Childs*, 944 F.2d 491, 495 (9th Cir. 1991).  "It
is the government's burden to prove that the consent was freely
and voluntarily given."  *United States v. Rodriguez*, 464 F.3d
1072, 1077 (9th Cir. 2006) (*quoting United States v. Soriano*, 361
F.3d 494, 501 (9th Cir. 2004)).  The Ninth Circuit considers the
following factors in determining whether consent to search was
voluntarily given:

> (1) whether [the] defendant was in custody; (2) whether the
> arresting officers had their guns drawn; (3) whether *Miranda*
> warnings were given; (4) whether the defendant was told he
> had the right not to consent; and (5) whether the defendant
> was told that a search warrant could be obtained.

*United States v. Perez-Lopez*, 348 F.3d 839, 846 (9th Cir.
2003) (*quoting United States v. Cormier*, 220 F.3d 1103, 1112 (9th
Cir. 2000).

In a case such as this one involving a foreign national, the
Ninth Circuit will look to several additional factors to
determine whether consent to search was voluntarily given.
*United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000).
Those factors include the following:

> whether the defendant signed a written waiver; whether the
> advice of rights was in the defendant's native language;

PAGE 15

whether the defendant appeared to understand those rights;
whether the defendant had the assistance of a translator;
whether the defendant's right were explained painstakingly;
and whether the defendant had experience with the American
criminal justice system.

The Court finds based on the totality of the circumstances
in this case, including considered application of the above
factors, that Defendant's consent to search was not voluntarily
given.  Although Defendant was not "in custody" for purposes of
triggering *Miranda* warnings, a reasonable person in his situation
would not have felt free to leave and refuse Officer Donnelly's
questions.  In addition, while the Court has concluded that
*Miranda* warnings were not technically required, it is
nevertheless a factor for this Court to consider in assessing
voluntariness.  This Court finds it significant that Officer
Donnelly did not advise Defendant of his rights in what clearly
became a coercive atmosphere in the patrol car.

The coercive nature of the encounter is evident throughout.[8]
For example, after Officer Donnelly began asking Defendant about
the presence of drugs in the car, Defendant said "but I say I'm
go."  Officer Donnelly responded by asking Defendant whether he
had any drugs in the car, and continued his barrage of questions
only to receive repeated denials.  Officer Donnelly testified at

---

[8] The Court recognizes that Officer Donnelly did not at any
time have his gun drawn, which is one factor for the Court to
consider.  The atmosphere was nevertheless coercive for a number
of reasons as discussed below.

PAGE 16

the hearing that he and the Defendant had great difficulty communicating due to the language barrier.  That this was so is additionally clear from the fact that Officer Donnelly saw fit to present Defendant with a consent-to-search form in Spanish. Officer Donnelly instructed Defendant to read the form, but it is clear that he was given no initial opportunity to do so, as their dialogue continued without interruption.  Officer Donnelly told Defendant several times that he wanted to search his car, but Defendant refused to grant his permission.  That Defendant did not intend to consent to a search is clear from that portion of their conversation, set forth above at page 6, in which Defendant said "no" to Officer Donnelly's request.  When Donnelly characterized Defendant's response as a "yes," Defendant was quick to correct him, explaining in broken English that his "ok" was not to the search.  The Court is hard-pressed to characterize the atmosphere in the patrol car during the prolonged stop as anything other than coercive in nature.

Turning to the remaining factors bearing upon the question of voluntariness, the Court finds that although Defendant ultimately signed the consent-to-search form, which was written in his native language, whether he had time to actually read the form is at best unclear.  At one point, Defendant began reading the form, but that reading lasted only a matter of seconds.  The form is of such a length that Defendant could not possibly have read it in that time period, and the Court notes it took him

PAGE 17

almost two minutes to read it out loud in open court at the suppression hearing.  Finally, at the end of their encounter, Officer Donnelly left his vehicle for nearly a minute, during which time Defendant apparently had the form in hand.  Whether he would have had time to read and understand the form during this time frame is likewise unclear, particularly in light of the fact that he had been subject to the increasingly coercive atmosphere of the patrol car for roughly forty minutes by that time.[9]

In sum, and based on the foregoing discussion, this Court finds based on the totality of the circumstances that the Government has not met its burden of establishing that Defendant voluntarily consented to the search of his vehicle.  Because Defendant did not voluntarily consent to the search, the evidence seized as a result of the search should be suppressed.

---

[9] Many of the remaining factors for this Court's consideration are neutral in this case.  There was no discussion, for example, of whether Officer Donnelly might attempt to get a search warrant.  Nor is there any evidence bearing upon Defendant's prior experience with the American criminal justice system.

PAGE 18